## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JAMES DANIELS,

       *Plaintiff,*

v.

TEDD CHRISTOFF,
PATRICK WARREN, and
ALAN GREASON,

       *Defendants.*

_____/

Case No. 2:20-cv-10469

Linda V. Parker
United States District Judge

Patricia T. Morris
United States Magistrate Judge

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF No. 55), DEFENDANTS' MOTION TO STRIKE (ECF No. 66), and PLAINTIFF'S MOTION TO AMEND (ECF No. 60)

### I.   RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **GRANT** Defendants' Motion to Strike (ECF No. 66) **IN PART**, **DENY** Plaintiff's Motion to Amend (ECF No. 60),[1] and **GRANT** Defendants' Motion for Summary Judgment (ECF No. 55) **IN PART**.

---

[1] Although Plaintiff labels his document as a declaration, based on the relief he seeks, the Court construes this as a motion to amend.

1

If adopted, the Court would allow Daniels to proceed on a Fourth Amendment Claim against Defendant Christoff based on his November 3, 2018, strip search. The Court would enter summary judgment in favor of the Defendants on all other claims.

## II.   <u>REPORT</u>

### A.   **Background**

James Daniels is a prisoner in the custody of the Michigan Department of Corrections ("MDOC"). Daniels alleges that a corrections officer, Tedd Christoff, performed an unconstitutional strip search, and after Daniels complained of the search in a formal grievance, Christoff and others began to retaliate against him.

### 1.   **The Strip Search**

In November 2018, Daniels completed a shift as a custodial porter in his prison's administrative segregation unit. (ECF No. 55-4, PageID.425). Under MDOC Policy, all prisoners who are "admi[tted] to" or "release[d] from" segregation must be undergo a routine, visual strip search. (*Id.* at PageID.437). These searches generally "require[]" prisoners to "bend and spread [their] buttocks to allow inspection" of their anus. (*Id.* at PageID.435). Corrections officers at the prison regularly apply this regulation to porters, like Daniels, who they strip search before and after each shift. (*Id.* at PageID.425; *see also* ECF No. 1, PageID.6, 19).

Following this custom of strip-searching porters, Christoff conducted a routine strip search of Daniels as he exited the segregation unit. Christoff does not

claim to have suspected Daniels of smuggling contraband out of the segregation unit; he conducted the search purely as a routine matter.  (ECF No. 55-4, PageID.425, ¶ 4 (citing *id.* at PageID.437)).  During the search, Christoff ordered Daniels to spread his buttocks, but after Daniels did so, Christoff stated that he was not looking and directed Daniels to spread his buttocks again.  (ECF No. 1, PageID.19).  Daniels complied, but Christoff stated that he did not spread his buttocks wide enough and asked Daniels to spread his buttocks a third time.  (*Id.*)  Daniels refused to comply with this order.  (*Id.* at PageID.21).  So to encourage Daniels's cooperation, Christoff locked Daniels in a segregation cell for about five minutes.  (*Id.*)  Daniels submitted to the search after he was released, but he submitted a formal grievance regarding the strip search under the Prisoner Rape Elimination Act ("PREA") the following day.  (*Id.* at PageID.19, 21).

## 2.    The Pat-Down

The PREA inspector assigned to the grievance did not label the grievance as "received" until over three weeks after Daniels submitted it.  (*Id.* at PageID.19).  About two weeks before then, Daniels claims that he was approached by Christoff in the prison yard while walking to his porter shift in the segregation unit.  (*Id.* at PageID.22–23).  Because Christoff was responsible for "ensur[ing] that inmates had a valid reason to leave their unit" and Daniels was in the yard "past dark," Christoff asked Daniels for his itinerary, which would have confirmed his work detail.  (ECF

No. 55-4, PageID.426–27, ¶¶ 10–14).   Although Daniels was required to keep this document on his person, he did not have his itinerary.   (ECF No. 1, PageID.22–23).   Christoff then ordered Daniels to submit to a clothed "pat-down," but Daniels refused to remove his coat, and Christoff then escorted him to segregation and issued a misconduct ticket.   (*Id.*; *see also* ECF No. 55-4, PageID.427–28, ¶¶ 15–21).   This ticket, however, was "thrown out" the following day.   (ECF No. 1, PageID.23).

### 3.   The Formal Count

Daniels next noteworthy encounter with Christoff occurred in April 2019.   (ECF No. 55-4, PageID.428).   During this incident, Christoff was conducting an evening "formal count" of Daniels's housing unit at about 9:30 pm.   (ECF No. 55-4, PageID.429–31; *see also* ECF No. 1, PageID.30).   To conduct the count, Christoff ordered all prisoners to return to their cell and lie on their bunk.   (ECF No. 55-4, PageID.429–31).   But when Christoff reached Daniels's cell, Daniels was lying under his blanket and facing the wall with headphones in and a "knit hat" covering most of his face.   (ECF No. 1, PageID.30; *see also* ECF No. 55-4, PageID.429).   Because he could not identify Daniels, Christoff knocked on the cell door and "raised [his] voice" to "determine" Daniels's identity.   (ECF No. 55-4, PageID.429).   When Daniels did not respond, and Christoff entered the cell after ordered Daniels's cellmate to exit.   (*Id.*)   Christoff then ordered Daniels, "several times," to "uncover" his face, yet Daniels remained unresponsive.   (*Id.*)

4

From this point, Daniels and Christoff tell different versions of events. According to Daniels, Christoff then woke him up by "shaking" his buttocks. (ECF No. 1, PageID.30, 32–34). Once Christoff verified his identity, Daniels claims, he "smil[ed]" at him and told him to "have a good night" before exiting the cell. (*Id.*) Christoff, of course, denies touching Daniels's buttocks, explaining that he woke Daniels by lifting his blanket. (ECF No. 55-4, PageID.431). Daniels later filed a grievance concerning this incident. (ECF No. 1, PageID.9, 33–34).

### 4.    The Prison Transfer

In July, Daniels was transferred to the Kinross Correctional Facility, a prison in the Upper Peninsula. (ECF No. 29-3, PageID.161-65). Daniels alleges that he was transferred by Warden Patrick Warren and Assistant Deputy Warden Alan Greason in retaliation for filing grievances. (ECF No. 1, PageID.10, 38-44; ECF No. 29-3, PageID.161-65.) Both Warren and Greason deny that they had the authority to transfer Daniels. (ECF No. 55, PageID.389). Rather, Daniels's transfer was orchestrated by the MDOC's "Correctional Facilities Administration" and a "transfer coordinator" at the prison. (ECF Nos. 55-6).

As a result of the transfer, Daniels alleges that he could no longer participate in a unique "dog training program." (ECF No. 1, PageID.10). He also claims that the transfer delayed a "surgery" on his "hand [and] elbow." (*Id.*)

5

But for the dog training program, Daniels generally had access to the same programs and opportunities that were available in his original facility. (ECF No. 56-4, PageID.559, ¶ 9). And while Daniels claims that the transfer delayed his surgery, he had no surgeries scheduled before his transfer. (ECF No. 55-8, PageID.467–68, ¶¶ 11, 20). In fact, he met with a provider less than three weeks after his transfer and within four months of his transfer, his provider recommended surgery, which he received soon after. (*Id.* at PageID.467–68, ¶¶ 13–20).

### 5.    Procedural History

Daniels eventually filed this case against Christoff, Greason, and Warren, alleging that the Defendants violated the PREA and the First, Eighth, and Fourteenth Amendments of the United States Constitution. (ECF No. 1). The Defendants have now moved for summary judgment on all of Daniels's claims. (ECF No. 55). They have also filed a motion to strike various filing from the record. (ECF No. 66). One of these documents is a filing labeled as a "[d]eclaration in opposition to Defendants' Motion for Summary Judgment" which is, in substance, a motion to amend the complaint. (ECF No. 60, PageID.798–801).

### B.    Standard of Review

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that would affect

"the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ." *Id.* at 249–50, 255. Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004). The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)). Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact [to] find in its favor." *Anderson*, 477 U.S. at 248.

### C. Analysis

#### 1. Motion to Strike

Before reaching the merits of their motion for summary judgment, the Defendants ask the Court to "strike" four documents they describe as "declarations" attached to Daniels's response brief under Federal Rule of Civil Procedure 12(f)(2). (ECF No. 66, PageID.923–24, 932). Three of these declarations, the Defendants argue, were signed by other inmates who are not parties in this case. (ECF No. 66, PageID.934 (citing ECF No.59, PageID.648–50)). But Daniels did not produce

these declarations or identify these individuals in his responses to various interrogatories and document requests that asked him to "identify any" potential witnesses and "produce any "documents . . . that support" his claims.   (*Id.* at PageID.940–42).  Nor did he supplement his responses as required by Federal Rule of Civil Procedure 26(e).  (*Id.*)  The Defendants argue that the other declaration, although signed by Daniels himself, must be stricken because it "fails to make any specific allegations" and instead "vouch[es] for the 'evidence in his opposition to summary judgment . . . .'"  (*Id.* at PageID.934 (citing ECF No. 59-1, PageID.722))

In addition, the Defendants move the Court to strike one of Daniels's filings, which he labels as a "[d]eclaration in opposition to Defendants' Motion for Summary Judgment."  (ECF No. 60, PageID.798).  This filing, in essence, is a motion to amend Daniel's complaint to refine his averments regarding the Court's jurisdiction and add unspecified "state law tort claims."  (*Id.* at PageID.799–801).

The Defendants start their argument on the wrong foot: Rule 12(f) does not allow the Court to strike motions or declarations.  Indeed, Rule 12(f) applies only to "pleading[s]," allowing courts to strike allegations it finds to be "redundant, immaterial, impertinent, or scandalous . . . ."  Fed. R. Civ. P. 12(f); *see also Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2018 WL 5017747, at *1, *3–5 (D.D.C. Oct. 16, 2018); *Hernandez-Butler v. Ikea U.S. East, LLC*, 435 F. Supp. 3d 816, 832-833 (S.D. Ohio 2020).  *See generally* Fed. R. Civ. P. 7(a) (defining the term "pleadings"

for purposes of the Federal Rules of Civil Procedure).  Still, the Rules provide the Defendants with other mechanisms for relief.

### a.      Daniels's Nonparty Declarations

To the extent the Defendants move to strike Daniels's declarations from his fellow inmates, Rule 37(c) governs—not Rule 12(f) or the Court's inherent power to strike "[filing[s] that fail to follow" the "rules of Civil Procedure" or the Court's "local rules."  (ECF No. 66, PageID.940–41).  Under Rule 26 any party "who has responded to an interrogatory" or a "request for production . . . must supplement" its response if it "learns that in some material respect the disclosure is incomplete . . . ."  Fed. R. Civ. P. 26(e)(1)(A).  And where, as here, the party fails to do so, Rule 37(c) prohibits the party from using the withheld information "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); s*ee also Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357, 369–70 (6th Cir. 2010); *Vance ex rel Hammons v. United States*, 182 F.3d 920 (6th Cir.1999).

Each of these declarations contains information relevant to Daniels's claims, and Daniels does not dispute that he failed to supplement his responses.[2]  (ECF No.

---

[2] Defendants concede that Daniels did state that he may call on one of the declarants, Raymond Hall, as a witness at trial.  (ECF No. 64, PageID.831).  But Daniels stated that he would call Hall to testify on matters unrelated to those in Hall's declaration.  (*Id.*)

59, PageID.648–50).   Nor does he explain why his failure to supplement his responses may have been substantially justified.   Yet Daniels's failure to supplement his responses prejudiced the Defendants by depriving them of an opportunity to conduct additional discovery related to these potential witnesses before they moved for summary judgment.   *Cf. Sommer v. Davis*, 317 F.3d 686, 691–92 (6th Cir. 2003).   The Court, therefore, should "exclude[e]" these declarations from consideration as a discovery sanction under Rule 37(c)(1).   *Bessemer*, 596 F.3d at 369.

### b.    Daniels's Declaration

Unlike the declarations written by his fellow inmates, Daniel's document, which the Defendants describe as a "declaration," contains no evidence, and therefore cannot be used to raise a genuine dispute of material fact.   *See Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004); Fed. R. Civ. P. 56(c)(1).   Yet neither Rule 37, Rule12(f), nor the Court's inherent powers provide a basis for the Court to "strike" exhibits that cannot be used establish a material fact.   And for their part, the Defendants seem to acknowledge as much, as they rely instead on a Sixth Circuit opinion, *Alexander v. CareSource*, 576 F.3d 551, 559–60 (6th Cir. 2009), for the proposition that the Court can strike "inadmissible" exhibits from the record.

---

(*Compare* ECF No. 59, PageID.648, *with* ECF No. 64-3, PageID.848–49).   In any event, Daniels did not produce the declaration when requested to do so by the Defendants.

(ECF No. 66, PageID.942–43).   But *Alexander* contains no such holding.   All *Alexander* stands for is the proposition that declarations comprised of "[c]onclusory statements unadorned with supporting facts" cannot "establish a factual dispute" for purposes of Rule 56.   576 F.3d at 559–60.   Nowhere in the opinion does the Sixth Circuit state that Courts should "strike" inadmissible exhibits.   *Id.*

So if Daniels's document were a declaration that could not be used to challenge Defendants' motion for summary judgment, then the remedy would not be to strike the declaration, but simply to not find a genuine dispute of material fact based on any of its assertions.   *E.g.*, *Taylor v. Kimmel*, No. 1:17-CV-1084, 2019 WL 5273944, at *2 (W.D. Mich. Jan. 7, 2019), *report and recommendation adopted by* 2019 WL 4200108 (W.D. Mich. Sept. 5, 2019).

But the document Defendants cite is not a declaration in support of Daniels's brief.   It is an attempt to verify his "evidence . . . motions, affidavits and pleadings" under 28 U.S.C. § 1746 (2018), such that those materials may be used to contest Defendant's summary judgment motion.   (*See* ECF No. 591, PageID.722).   That is why the single-page document contains no "specific" statements of fact.   (ECF No. 66, PageID.942–43).   Its purpose is not to "vouch[]" for the allegations in his brief, pleadings, and other materials, it is to certify, "under penalty of perjury," that these materials are "true and correct," based "on personal knowledge," and "set forth facts that would be admissible in evidence."   *Cf.* 28 U.S.C. § 1746(1).   His document

borrows much of the language found in § 1746(1), and it cannot be understood as anything other than an attempt to verify his pleadings and response brief such that their contents may be considered on the Defendants' motion for summary judgment.

True, there may be deficiencies in Daniels's certification, and his certification may not allow him to rely on all of the materials he lists. But the Defendants cannot circumvent these issues by mischaracterizing the document as a declaration and having it stricken from the record. The document, at bottom, is not a declaration in itself, and therefore I suggest that it contains nothing for the Court to strike or exclude from consideration.

### c.    Motion to Amend

As for Daniel's motion to amend the complaint, the Court need not decide whether to "strike" this document from the record. Instead, it must simply decide whether to grant or deny the motion under Rule 15(a) and the Court's local rules.

Rule 15(a)(1) allows plaintiffs to amend their pleadings "once as a matter of course" within twenty-one days of service, or, "[i]f the pleading is one to which a responsive pleading is required," within twenty-one days of service of the responsive pleading. Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2); *Commerce Benefits Group, Inc. v. McKesson Corp.*, 326 F. App'x 369, 376 (6th Cir. 2009). The Defendants have not consented in writing to

Daniels's proposed amendment, and the time for Daniels to amend his complaint as a matter of right has passed.  (*See* ECF Nos. 15, 18, 19).  So now, Daniels must obtain the Court's leave to amend his complaint.  Fed. R. Civ. P. 15(a)(1).

Typically, a plaintiff will amend his or her complaint by providing the court with a new complaint, alongside the plaintiff's motion, that realleges all facts, claims, and defendants the plaintiff desires to retain from the original complaint.  *See Young v. Dobblestein*, No. 0:18-114-HRW, 2019 WL 2648810, at *1 (E.D. Ky. June 27, 2019).  Yet Daniels did not do this.  His motion simply expresses his desire to amend his jurisdictional statement and add some state law claims without realleging any of his allegations.  (ECF No. 60).

The Court's local rules do not allow Daniels to amend his complaint in this manner.  Under Local Rule 15.1, a plaintiff "*shall* attach the proposed amended" complaint "to the motion," and the proposed pleading must "reproduce the entire pleading as amended" without "incorporat[ing] any prior" allegations "by reference." E.D. Mich. LR 15.1 (emphasis added).[3]  But a party's failure to follow this rule "is not grounds" to disallow the amendment.  *Id.*  Accordingly, Daniels's motion to amend his complaint should be denied without prejudice—meaning that

---

[3] But for Local Rule 15.1, the Court would have discretion to allow Richardson to amend his complaint by adopting the allegations from his original complaint by reference.  Wright, *supra*, § 1476; *see also Carroll v. Fort James Corp.*, 470 F.3d 1171 (5th Cir. 2006); *Kolling v. American Power Conversion Corp.*, 347 F.3d 11, 17 (1st Cir. 2003); *Brown v. Voorhies*, No. 1:07-CV-463, 2009 WL 2730522, at *3 (S.D. Ohio Aug. 26, 2009).

he may ask the Court again to allow his proposed amendment.  If Daniels renews his motion, he must comply with Rule 15.1 and attach a proposed complaint that contains all his allegations, realleging any facts from his original complaint he does not wish to amend.  This proposed complaint will supersede and nullify all of Daniels's original complaint if accepted.  *See B&H Medical, LLC v. ABP Admin., Inc*. 526 F.3d 257, 268 n.8 (6th Cir. 2008).

### 2.  Motion for Summary Judgment

### a.  Sexual Assault Claims

Daniels alleges that he was sexually assaulted by Officer Christoff on two occasions.  On the first occasion, Daniels submitted to a routine, visual strip search after completing his shift as a porter in the segregation unit.  (ECF No. 1, PageID.6–7).  Christoff explains that he conducted this search to comply with an MDOC policy that requires all inmates entering or leaving the segregation unit to undergo a visual strip search.  (ECF No. 55-4, PageID.425–26).  During the strip search, Christoff ordered Daniels to spread his buttocks three times, claiming that he was not looking when Daniels spread his buttocks in the first instance, and that when Daniels spread his buttocks for the second time, Daniels did not spread wide enough for Christoff to see whether he had stored contraband between his buttocks.  (ECF No. 1, PageID.19, 21).

The second incident occurred when Christoff conducted a "formal count" of Daniels's housing unit.  (ECF No. 55-4, PageID.429–31).  To conduct the count, Christoff ordered all prisoners to return to their cell and lie on their bunk.  But when Christoff reached Daniels's cell, Daniels was lying under his blanket and facing the wall with headphones in and a "knit hat" covering most of his face.  (*Id.*)  Because he could not identify Daniels, Christoff ordered him, "several times," to "uncover" his face.  Daniels did not respond, and Christoff then ordered Daniels's cellmate to exit the room before approaching Daniels.  (*Id.*)  According to Daniels, Christoff awoke him by "shaking" his buttocks, and once Christoff verified his identity he "smil[ed]" at Daniels and told him to "have a good night" before exiting the cell. (ECF No. 1, PageID.30, 32–34).

Daniels alleges that these incidents violate his rights under the Eighth Amendment and the PREA.  (*Id.* at PageID.4, 11).  But the PREA does not provide Daniels with a private right of action, meaning that he cannot enforce its requirements through a civil lawsuit. *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521, 537 (N.D. Ohio 2020).

Yet to the extent Daniels challenges Christoff's strip search, the Eighth Amendment is his only source of protection.  Indeed, Daniels's allegation that Christoff conducted an improper strip search implicates not just his Eighth Amendment right to be free of cruel and unusual punishment, but also his Fourth

Amendment protection against unreasonable searches.   True, Daniels does not mention the Fourth Amendment in his complaint.   But it is the facts Daniels alleges, not the sources of relief he identifies, that circumscribe the claims at issue in this case.   *Johnson v. City of Shelby*, 574 U.S. 10 (2014); *Skinner v. Switzer*, 562 U.S. 521, 530 (2011); *see also* 5 Charles Alan Wright, et al., Federal Practice and Procedure § 1219 & nn. 7–8 (4th ed. 2023).   And the Sixth Circuit has long recognized that the Eighth and Fourth Amendments provide overlapping protections against strip searches.   *Fugate v. Erdos*, No. 21-4025, 2022 WL 3536295, at *4, *13 (6th Cir. 2022) (citing *Henry v. Hulett*, 969 F.3d 769, 781 (7th Cir. 2020)).   *Compare Stoudemire v. Michigan Dep't of Corrs.*, 705 F.3d 560, 572 (6th Cir. 2013), *with Cornwell v. Dahlberg*, 963 F.2d 912, 918 (6th Cir. 1992).

For the following reasons, I suggest that Daniels only raises a genuine dispute as to whether Christoff violated his Fourth Amendment rights.

### i.   Fourth Amendment

The Fourth Amendment protects the people from "unreasonable" government searches.   U.S. Const. amend IV.   "Reasonableness," however, is a term that eludes "precise definition or mechanical application."   *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).   In any Fourth Amendment context, determining the reasonableness of a search ultimately requires courts to balance the intrusiveness of a search against the

government's "justifications" for both "initiating" the search and for conducting the search in a particular manner.  *Id.*

Incarceration does not strip individuals of the Fourth Amendment's protections.  *Turner v. Safley*, 482 U.S. 78, 84 (1987).  So even behind prison walls, courts must weigh the state's need to search prisoners against prisoners' interests in privacy.  *Bell*, 441 U.S. at 559.  But unlike other contexts, prison administration involves "complex and intractable" problems that tip the scales in favor of the state. *See id.* at 548 n.30, 559–60 (quoting *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974)).  Indeed, prison administration is an "inordinately difficult undertaking" which "courts are ill-equipped to deal with."  *Turner*, 482 U.S. at 78.  And for that reason, courts should "accord deference" to the judgment of prison officials.  *Id.* at 85.

To that end, courts scrutinize government searches of prisoners under the same deferential standard applied to most other constitutional rights in the prison context: the state may search a prisoner if the search is "reasonably related to legitimate penological interests" and is not an "exaggerated response" to its objectives.  *Turner*, 482 U.S. at 87, 89, 90–91; *see Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326, 330 (2012) (recognizing that the *Turner* standard applies to Fourth Amendment searches); *Williams v. City of Cleveland*, 771 F.3d 945, 949–50 (6th Cir. 2014) (same); *Stoudemire*, 705 F.3d at 572 ("We review a

correctional officer's discretionary actions under essentially the same deferential standard" as *Turner*).

To determine whether a search is "reasonable," courts first determine whether there is a "'valid, rational connection' between the" search "and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89–90.  If there is no "rational connection," then the search cannot be reasonable.  *Id.*  If the search passes this threshold inquiry, then courts look to three factors to determine whether the search nonetheless constitutes an "exaggerated response" to the government's objectives: (1) "whether there are alternative means of exercising the right that remain open to prison inmates"; (2) "the impact accommodation of the asserted constitutional right" would have on the prison; and (3) "the absence of ready alternatives." *Id.* at 90–91.

To determine whether a strip search passes muster under this standard, courts must undertake a "three-step analysis." *Sumpter v. Wayne Cty.*, 868 F.3d 473, 482 (6th Cir. 2017).  First, courts must assess "the nature of the intrusion." *Id.*  A strip search is always an "extreme intrusion upon personal privacy," but not all strip searches are equally intrusive.  *Stoudemire*, 705 F.3d at 572 (quoting *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996)).  Indeed, the intrusiveness of strip searches varies significantly depending on both their scope and the manner in which they are conducted.  *Id.*  As to the search's scope, courts should consider what parts

of the individual's body were inspected and whether that inspection involved physical contact. *See id.* And as to a search's manner, courts should consider whether any other aspects of the search made it unusually offensive. Did the state official make any derogatory, humiliating, or sexual remarks during the search? *See Sumpter*, 868 F.3d at 483. Was the search conducted by an official of the opposite sex? *Michenfelder v. Sumner*, 860 F.2d 328, 334 (9th Cir. 1988). Or was the search conducted in view of other people? *Sumpter*, 705 F.3d at 483.

Second, Courts must "evaluate the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions." *Stoudemire*, 705 F.3d at 572. And third, Courts must apply the *Turner* standard to "weigh" the State's "need against the invasion" by "determin[ing] whether the search was reasonably related to legitimate penological interests." *Id.* Although this standard generally allows the state to pursue its interests through loosely tailored means, the Sixth Circuit applies *Turner* rigorously in the strip search context, holding searches to be unreasonable whenever they are that are more intrusive than necessary to achieve their stated purpose. *See, e.g.*, *Williams*, 771 F.3d at 954–56 (holding that a group of inmates plausibly stated a Fourth Amendment violation by alleging that officials sprayed them with a delousing agent even though the inmates could have applied the delousing agent themselves); *Stoudemire*, 705 F.3d at 573–74 (holding that a corrections official violated the Fourth Amendment by strip searching a

prisoner in view of other inmates without any justification for not conducting the search in a private location).

Christoff's strip search was inherently a "'humiliating and deeply offensive'" invasion of Daniels's privacy. *Stoudemire*, 705 F.3d at 572–73 (quoting *Florence*, 566 U.S. at 341 (Alito, J., concurring)). Yet nothing occurred during the search that rendered it unusually intrusive compared to other strip searches. Christoff did not touch Daniels. (ECF No. 55-4, PageID.425, ¶ 7). He did not make any lewd or demeaning comments. (*Id.* at PageID.425, ¶ 8). Nor did he conduct the search in view of others. (*See* ECF No. 1, PageID.6, 19 (conceding that Christoff conducted the search in a designated "strip room")). True, ordering Daniels to spread his buttocks three times—rather than only once—may have rendered the search more intrusive, but only marginally so.

On the other hand, Christoff only searched Daniels to find (or deter the circulation of) contraband, which is a legitimate penological interest. *See Florence*, 566 U.S at 327–28. And because the strip search could have conceivably found contraband, or deterred Daniels from smuggling contraband from the segregation unit, the reasonableness of the strip search turns on whether it was an "exaggerated response" to the state's interest in detecting contraband. *See Turner*, 482 U.S. at 89–91; *Bell*, 441 U.S. at 559.

20

The Supreme Court has allowed corrections officials wide latitude to conduct strip searches at points-of-entry where inmates can bring contraband *into* the prison system. Indeed, the Court has twice upheld blanket policies that mandate visual strip searches after inmates have had contact with individuals in the general public—even where officials lack individualized suspicion of smuggling. In the first case, *Bell v. Wolfish*, the Court upheld a policy requiring visual body cavity searches of all inmates returning from "contact visits" with individuals from "outside the institution." 441 U.S. at 558–59. And thirty years later in *Florence*, the Court applied the standards it set forth in *Bell* and *Turner* to uphold a jail's policy requiring all new pretrial detainees to undergo a visual strip search before entering the general population. 566 U.S. at 330, 339.

Unlike the searches in *Bell* and *Florence*, designed to control the "influx" of contraband into the prison, "internal searches conducted to curtail the circulation of contraband within a prison implicate far less compelling security interests." *Arruda v. Fair*, 710 F.2d 886, 891 (1st Cir. 1983). Unlike point-of-entry searches, officials do not "block the introduction of contraband—they merely deter and detect its circulation." *Id.*

Still, lower courts have extended *Bell* and *Florence* to uphold policies requiring routine "internal" searches without individualized suspicion of smuggling under appropriate circumstances. In *Arruda v. Fair*, for example, the First Circuit

21

upheld a policy that required all inmates housed "in a special maximum security unit" to undergo visual strip searches before and after entering "the prison law library" or the "infirmary," regardless of whether officials held an individualized suspicion of smuggling.[4]   710 F.2d 886, 886.   Recognizing that the unit housed exceptionally dangerous prisoners with a demonstrated history of "contraband problems," the court easily found that strip searches following library and infirmary visits were a reasonable means of ensuring that they did not obtain contraband from staff or inmates in these facilities.   *Id.* at 888.

"The close[r] question," in the court's view, was whether the prison needed to conduct strip searches when prisoners left their cells to go to the library or infirmary. Indeed, the prisoners had already been searched before returning to their cells where they lived in "relative isolation."   *Id.*   Yet the Court reasoned that these precautions were undermined by a pattern of "prison employee smuggling," citing "eight" known instances where "guards themselves were found to have been involved in smuggling."   *Id.*   Thus, the court held that these searches, too, were a reasonable means of keeping contraband away from the "most dangerous prisoners."   *Id.*; *see also Michenfelder*, 860 F.2d at 332–33 (upholding a similar policy because it

---

[4] *Accord Michenfelder*, 860 F.2d at 332–33; *Hay v. Waldron*, 834 F.2d 481, 486 (5th Cir.1987); *Goff v. Nix*, 803 F.2d 358, 364–65 (8th Cir.1986); *Abrams v. Erfe*, No. 3:17-CV-1570, 2018 WL 3238825, at *4–6 (D. Conn. July 3, 2018); *Israel v. City of New York*, No. 11 Civ. 7726 (JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012); *Goins v. Horne*, No. 4:13-cv-1269, 2014 WL 4269263, at *4 (S.D.S.C. July 30, 2014).

deterred prisoners with "history of maladaptive behavior within prison" from obtaining contraband); *Hay*, 834 F.2d at 486 (same).

To the extent Daniels claims that Christoff conducted the search in an unreasonable manner by ordering him to spread his buttocks three times, I suggest that his argument lacks merit. Assuming that Christoff could reasonably initiate the search, his requests were not unreasonable as nothing in the record contradicts his assertions that he did not see between Daniels's buttocks the first two times that Daniels spread his cheeks. (ECF No. 55-4, PageID.425, ¶¶ 5–6; *see also* ECF No. 1, PageID.19, 21). And locking Daniels in a cell for a few minutes after he initially refused to spread his buttocks a third time was a reasonable measure to encourage compliance with his order. (ECF No. 1, PageiD.21).

Yet far more troubling than Christoff's manner of conducting the search is that he conducted this search at all. Under these circumstances, strip searching Daniels after his porter shift was an exaggerated response to the prison's interest in detecting contraband. To start, Christoff concedes that he had no individualized suspicion that Daniels possessed contraband. Rather, he conducted the search solely out of compliance with an internal MDOC policy that requires all porters to undergo strip searches before and after any shift in the administrative segregation unit. (ECF No. 55-4, PageID.425, ¶ 4 (citing *id.* at PageID.437)). But it is far from clear whether the policy he cites even applies to porters like Daniels. The regulation requires

23

routine strip searches—not of prisoners who "enter" or "leave" the segregation unit—but of prisoners who are "admi[tted] to" or "release[d] from" the unit. (*Id.* at PageID.437). Thus, the regulation Christoff relies on appear to apply to prisoners who are housed in segregation. (*See id.*)

Even if Daniels fell within the ambit of this this policy, the policy itself is not reasonable, at least as it was applied here. Not only did Christoff lack any individualized suspicion of smuggling, but he did not conduct the search at a point of entry into the prison—a fact that undermines the substantial security interests that justified routine searches in *Bell* and *Florence*. *Cf. Florence*, 566 U.S. at 330–39; *Bell*, 441 U.S. at 558–59. It is axiomatic that the mere abstract possibility that a strip search might detect or deter contraband is an unreasonable basis to conduct random strip searches of inmates in a person's general population. *See Arruda*, 710 F.2d at 890–91 (Maletz, J., dissenting in part). To hold otherwise would be to eschew *Turner*'s reasonableness standard in favor of rational basis review. Thus, courts have only found intra-prison strip searches, performed without suspicion of smuggling, to be reasonable under extenuating circumstances.

Yet none of the circumstances present in *Arruda* and similar cases exist here. The record contains no evidence that smuggling was an unusually rampant problem in the prison. Further, Daniels was not housed in segregation himself and the Defendants do not otherwise characterize him as a particularly dangerous inmate

who needed to be searched for contraband before interacting with others.  And while Daniels could have smuggled contraband into the segregation unit, where it could be used by "dangerous prisoners," searching him as he exited the unit could not mitigate this risk.  *Cf. Arruda*, 710 F.2d at 887.

The search here might be differentiated from a random strip search of an inmate in the general population on the basis that porters in the administrative segregation unit occupy a unique position to smuggle contraband.  Because inmates in administrative segregation live in "relative isolation," they would conceivably depend on others to smuggle contraband in and out of their cells.

But Christoff does not explain how contraband might enter the administrative segregation unit to begin with.  He concedes that all inmates who enter the unit are strip searched beforehand, and he gives the Court no reason to believe that these intrusive searches are ineffective at detecting contraband.  (ECF No. 55-4, PageID.425).   Nor does Christoff cite any instances where his coworkers have smuggled contraband into the segregation unit.  *Cf. Arruda*, 710 F.2d at 886.  At bottom, he leaves the Court to speculate as to how officials might uncover contraband by searching inmates as they *exit* the segregation unit.

Although *Turner* instructs courts to treat a corrections officer's judgment with deference, *Turner* has never been a rubber stamp.  *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *see Stoudemire*, 705 F.3d at 572 (explaining that *Turner* applies to

a "correctional officer's discretionary actions . . ."). Christoff cannot simply recite a vaguely applicable penological interest and expect the Court to perform the heavy lifting of figuring out how, exactly, the strip search advances that interest. True, Daniels bears the "burden" of "disprov[ing]" the search's "validity," but Rule 56 requires Christoff to show that Daniels cannot genuinely dispute the jail's validity. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *see Ramirez v. Pugh*, 468 F. Supp. 2d 421, 426 (M.D. Pa. 2007); Fed. R. Civ. P 56(a). Yet on this thin record, a reasonable factfinder could view the search as an exaggerated response to the prison's interest in controlling contraband.

Finally, I appreciate that Christoff conducted the search believing that he was required to do so by MDOC policy, but that does not shield him from liability. The United States Constitution—not the MDOC's policy directives—is the "supreme Law of the Land." U.S. Const. Art. VI, cl. 2. So where state policy conflicts with the Constitution, officials must decline to enforce those illegal policies, and their failure to so exposes them to liability in their individual capacities. *Farid v. Smith*, 850 F.2d 917, 921–23 (2d Cir. 1988); *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 354 (S.D.N.Y. Sept. 26, 2000); *see Loukas v. Hofbauer*, 784 F. Supp. 377, 378–80 & n.1 (citing *Cowan v. University of Louisville School of Med.*, 900 F.2d 936 (6th

Cir.1990)).[5]   Thus, Christoff has failed to carry his burden of establishing the absence of a genuine dispute of material fact as to whether he violated Daniels's Fourth Amendment rights, and I recommend that the Court deny summary judgment insofar as the November 2018 strip search implicates the Fourth Amendment.

### ii.    Eighth Amendment

Christoff does carry his burden of establishing that he is entitled to judgment as a matter of law on Daniels's Eighth Amendment claims.  The Eighth Amendment prohibits "cruel and unusual punishment." U.S. Const. amend. VIII.  This protection applies not only to the terms of a convicted defendants' sentence, but also to the "conditions under which" a prisoner "is confined." *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

Unlike the Fourth Amendment, which scrutinizes the objective reasonableness of a search or seizure, the Eighth Amendment "safeguards prisoners against [conduct] that correctional officers subjectively intend as a form of punishment." *Henry*, 969 F.3d at 781.  Thus, all Eighth Amendment claims consist of not only an objective component, assessing whether the prisoner's injury is

---

[5] If such a conflict between state and federal law would prevent a reasonable officer from determining whether his or her conduct violates clearly established law, then qualified immunity would protect the officer from liability. *Farid*, 850 F.2d at 923.  Yet Christoff does not raise qualified immunity in his brief, and he has therefore waived the defense for purposes of his Rule 56 motion. *Summe v. Kenton Cty. Clerk's Office*, 604 F.3d 257, 269–70 (6th Cir. 2010).

sufficiently serious, but also a subjective component, assessing whether the official acted with a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).  Indeed, is only the "unnecessary and wanton infliction of pain"— infliction of pain that is "totally without penological justification"—that violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976).

The precise subjective standard for an Eighth Amendment claim depends on the conduct at issue. *Hudson v. McMilllian*, 503 U.S. 1, 5–6 (1992).  Where the state fails to state has a duty to provide for an inmate's "basic human needs," such as "food, clothing, shelter, medical care, and reasonable safety," the subjective component is satisfied where an official acts with deliberate indifference by knowingly depriving the inmate of a necessity. *Farmer*, 511 U.S. at 836–37; *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). That "standard is appropriate because the State's responsibility to provide for inmates['] [basic needs] ordinarily does not conflict with competing administrative concerns." *Hudson*, 503 U.S. at 5–6.  That is, the knowing deprivation of basic human needs inherently lacks any "penological justification." *Id.*; *see also Johnson v. California*, 543 U.S. 499, 511 (2005)

In other contexts, such as where corrections officers use force to quell a prison riot, Courts ask whether an officer "maliciously and sadistically use[d] force to cause

harm." *Hudson*, 503 U.S. at 6–7.  In essence, this standard requires prisoners to show not just that an official knowingly caused harm, but that they carried out a specific act for the purpose of causing harm.  *See id.*

This latter standard applies where officials cross a prisoner's intimate bodily boundaries.  Unlike denying prisoners of a basic need, officials often have legitimate penological justifications for invading prisoners' bodily autonomy.  Indeed, corrections officials often must conduct cavity searches, pat-downs, and strip searches on prisoners, and most officials would surely be aware of the harmful and humiliating impact of these searches.  *See Florence*, 566 U.S. at 330–33.  So applying a deliberate indifference standard—that is, simply ask whether officials subjectively knew of the risk of harm—would significantly constrain the ability of corrections officers to conduct these type of searches.  *See Farmer*, 511 U.S. at 836–37.  The malicious and sadistic standard is better suited to tease out whether an invasion into a prisoner's bodily autonomy lacked any legitimate justification.  That is why the Sixth Circuit has applied the malicious and sadistic standard in the strip search context.  *Fugate*, 2022 WL 3536295, at *13 (citing *Cornwell v. Dahlberg*, 963 F.2d 912, 918 (6th Cir. 1992)).  And that is also why the Sixth Circuit has instructed lower courts to treat allegations sexual assault as excessive force claims, which are subject to the "malicious and sadistic" standard.  *Hale v. Boyle Cty.*, 18 F.4th 845, 853 (6th Cir. 2021).

No doubt, all sexual assault is both inherently sadistic and sufficiently serious to violate the Eighth Amendment. *Bearchild v. Cobban*, 947 F.3d 1130, 1143–44 (9th Cir. 2020). But not all invasions into an inmate's bodily privacy can be accurately described as a sexual assault. And not all conduct that crosses an intimate boundary is sufficiently serious to violate the Eighth Amendment. *Ricks v. Shover*, 891 F.3d 468, 476 (3d Cir. 2018). Some conduct, say a momentary and "incidental touching" of a sensitive bodily region, simply is not viewed by society as cruel and unusual. *Id.* at 476–78; *Miller v. Klee*, No. 17-cv-11006, 2020 WL 833322, at *7 (E.D. Mich. Jan. 27, 2020). So, even where a prisoner alleges an Eighth Amendment violation for conduct he or she describes as sexual assault, the prisoner must still demonstrate the conduct at issue is sufficiently serious. *Ricks*, 891 F.3d at 476–78; *Jackson v. Madery*, 158 F. App'x 656, 662 (6th Cir. 2005); *Lee v. Winn*, No. 20-12480, 2023 WL 8264524, at *3 (E.D. Mich. Oct 25, 2023).

To summarize, Daniels must be able to raise a genuine dispute as to whether (1) Christoff's conduct was sufficiently serious to violate the Eighth Amendment and (2) Christoff acted maliciously and sadistically with the purpose of causing harm.

To be sure, the November 2018 strip search was sufficiently serious to satisfy the objective prong of an Eighth Amendment violation. *See Stoudemire*, 705 F.3d at 572. But the later incident, where Christoff awoke Daniels by shaking his

buttocks, falls short.  Taking the facts in the light most favorable to Daniels, Christoff approached the cell during a formal count and had to wake Daniels after he failed to present himself.  (ECF No. 1, PageID.30–34).  Daniels concedes that he was lying in bed with his buttocks facing Christoff while he was under his sheets, with earbuds in and a hat over his face.  (*Id.*; *see also* ECF No. 55-4, PageID.428–31).  Nudging Daniels over his sheets to awake him was "not severe" enough to violate the Eighth Amendment, even if Christoff happened to touch Daniels's buttocks.  *See Jackson*, 158 F. App'x at 662.  That Christoff "smiled" and told Daniels to have a good night does not make the encounter any more serious.  (ECF No. 1, PageID.34).

At any rate, both incidents fail under the subjective component.  There is no evidence that Christoff conducted the strip search for any reason other than to comply with his understanding of MDOC policy.  (ECF No. 55-4, PageID.425).  Though the strip search may have been objectively unreasonable, Christoff did not perform it to punish Daniels.  (*See id.*)  Likewise, no reasonable factfinder could infer that Christoff shook Daniels's buttocks for any reason other than to awaken him and check on his well-being.  (*See id.* at PageID.428–31).  Accordingly, I recommend that the Court grant summary judgment in favor of Christoff on Daniels's Eighth Amendment claims.

###### b.    First Amendment Retaliation

That leaves Daniels's First Amendment retaliation claims.  The government may not punish individuals for exercising a protected constitutional right.  *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994).  Even "government actions" that typically would "not violate the Constitution, may" chill the "exercise of a constitutional right."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999).  Accordingly, a plaintiff alleging retaliation must establish three elements: (1) that he or she "engaged in protected conduct"; (2) that the defendant took "an adverse action" against him or her "that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) that "but-for" the plaintiff's protected conduct, the Defendant would not have subjected the plaintiff to the adverse action.   *Id.*; *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019) (internal quotation marks omitted).

Daniels alleges three incidents of retaliation.  But each falls short of a sufficiently "adverse action."

First, Daniels alleges that Christoff retaliated against him for filing a PREA grievance following the November 2018 strip search.  (ECF No. 1, PageID.8–9).  Specifically, he claims that he was approached by Christoff in the prison yard while walking to his porter shift in the segregation unit.  (*Id.* at PageID.22–23).  Because Christoff was responsible for "ensur[ing] that inmates had a valid reason to leave their unit" and Daniels was in the yard "past dark," Christoff asked Daniels for his

itinerary, which would have confirmed his work detail.   (ECF No. 55-4, PageID.426–27, ¶¶ 10–14).  Although Daniels was required to keep this document on his person, he did not have his itinerary.  (ECF No. 1, PageID.22–23).  Christoff then ordered Daniels to submit to a clothed "pat-down," but Daniels refused to remove his coat, and Christoff then escorted him to segregation and issued a misconduct ticket.  (*Id.*; *see also* ECF No. 55-4, PageID.427–28, ¶¶ 15–21).

Even if motivated by Daniels's PREA grievance, Christoff's conduct would not have deterred a reasonable person from filing grievances.  Showing papers and submitting to pat-downs are "routine inconvenience[s]" of prison life, and they are not sufficiently adverse to support a retaliation claim.  *Yates v. Rogers*, No. 2:18-cv-180, 2018 WL 6629366, at *6 (W.D. Mich. Dec. 9, 2018).   And while even the threat of administrative segregation (or a misconduct ticket) might be sufficiently adverse, Daniels concedes that Christoff threatened to place him in segregation because he did not remove his coat during the pat down, not because he filed a grievance.  (ECF No. 1, PageID.22–23); *see Maben v. Shaheen*, No. 17-10817, 2018 WL 3298076, at *5 (E.D. Mich. Jan. 31, 2018).

Next, Daniels alleges that when Christoff awoke him by shaking his buttocks, he did so in retaliation for grievances that Daniels had filed against him.  (ECF No. 1, PageID.9).  But this was not a serious affront, and no reasonable person would be

deterred from exercising their First Amendment rights based on this incident. *See Thaddeus-X*, 175 F.3d at 386.

Finally, Daniels alleges that Warren and Greason retaliated against him for filing grievances by transferring him to a facility in the upper peninsula. ECF No. 1, PageID.10). Generally, a prison transfer—whether it be to a different cell or a different facility—would not deter a person of ordinary firmness from engaging in First Amendment activity. *Mulazim v. Corrigan*, 7 F. App'x 427, 431 (6th Cir. 2001). This is because "prisoners are expected to endure more than the average citizen," and "transfers are common among prisons." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005); *see also Harbin-Bey*, 420 F.3d at 577.

There are only a few circumstances where a prison transfer might deter an individual from engaging in protected conduct. First, where a transfer foreseeably "inhibits" a prisoner's "ability to access the courts," it would deter an ordinary prisoner from engaging in protected conduct. *Siggers-El*, 412 F.3d at 702, 704. For example, in *Siggers-El v. Barlow*, prison officials transferred an inmate who was involved in litigation to a different facility, and as a result, the inmate lost a high paying job that he relied on to pay his attorney fees and had difficulty meeting with his attorney because he "was moved further away from her." *Id.* at 697–98, 702. The Sixth Circuit held that this transfer would deter a prisoner of ordinary firmness

from engaging in protected conduct because the inmate's loss of access to counsel would have been a reasonably foreseeable consequence of his transfer. *Id.* at 702.

The Sixth Circuit has also held that transfers to a more restrictive unit is adverse if the new unit is "comparable to . . . administrative segregation." *Thaddeus-X*, 175 F.3d at 396. For example, transfers to "lockdown units," or changes in a prisoner's "security level" that would place additional restrictions on a prisoner, may be adverse. *Hill v. Lappin*, 630 F.3d 468 (6th Cir. 2010); *King v. Zamiara*, 150 F. App'x 485, 494 (6th Cir. 2005). Still, courts generally do not consider transfers to general populations of different housing units to be adverse, even if the new housing units are less desirable or more restrictive. *See Mullazim*, 7 F. App'x at 431; *LaPine v. Johnson*, No. 1:17-cv-768, 2020 WL 6597342, at *4 (W.D. Mich. Jul. 20, 2020).

In the upper peninsula, Daniels generally had access to the same programs and opportunities that were available in his original facility. (ECF No. 56-4, PageID.559, ¶ 9). What made the transfer sufficiently adverse, Daniels contends, is that it (1) prevented him from participating in a dog-training program and (2) delayed a "surgery on his hand [and] elbow." (ECF No. 1, PageID.10). As enjoyable as the dog training program may have been for Daniels, no reasonable person would shy away from filing a grievance for fear of being removed from this program. And as for Daniels's wrist surgery, the record indicates that he experienced only a brief delay—if he experienced any delay at all. Indeed, Daniels met with a provider less

35

than three weeks after his transfer and within four months of his transfer, his provider recommended surgery, which he received soon after.  (ECF No. 55-8, PageID.467–68, ¶¶ 13–20).  No medical provider had recommended surgery before his transfer (*Id.* at PageID.467–68, ¶¶ 11, 20).

Accordingly, I recommend that the Court grant Defendants' motion and deny Daniels's claims of First Amendment retaliation.[6]

### D. Conclusion

For these reasons, **I RECOMMEND** that the Court **GRANT** Defendants' Motion to Strike (ECF No. 66) **IN PART**, **DENY** Plaintiff's Motion to Amend (ECF No. 60), and **GRANT** Defendants' Motion for Summary Judgment (ECF No. 55) **IN PART**.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. §

---

[6] Although Daniels also alleges that the Defendants violated his Fourteenth Amendment rights, he does not allege any facts that would state a cognizable claim under the Due Process or Equal Protection Clauses.  His allegation is best construed as a recognition that his First, Fourth, and Eighth Amendment rights are incorporated against the Defendants by the Fourteenth Amendment.

636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 1, 2024         s/ PATRICIA T. MORRIS
                                         Patricia T. Morris
                                         United States Magistrate Judge